**UNITED STATES of America, Plaintiff,**

v.

**Ana B. RUIZ, Defendant.**

No. 96–CR–227 S.

United States District Court,
D. Utah,
Central Division.

April 3, 1997.

Leshia M. Lee-Dixon, Assistant United States Attorney, District of Utah, Salt Lake City, UT, for Plaintiff.

Gregory Brent Smith, Salt Lake City, UT, Curt W. Morris, Provo, UT, for Defendant.

## ORDER

SAM, District Judge.

The defendant Ana B. Ruiz made a motion to suppress evidence that was obtained from her. The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). The magistrate judge made a report and recommendation that the defendant's motion to suppress be denied. No objection has been taken to the report and recommendation. The court has reviewed the file and hereby adopts the report and recommendation of the magistrate judge. Therefore,

IT IS HEREBY ORDERED the defendant Ana B. Ruiz' motion to suppress is denied.

## REPORT & RECOMMENDATION

BOYCE, United States Magistrate Judge.

The defendant, Ana B. Ruiz, is charged in one count by indictment with possession of amphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The offense allegedly occurred on October 9, 1996 (File Entry # 19). The defendant filed a motion to suppress (File Entry # 27). The defendant contends the initial encounter with defendant at the Salt Lake International Airport was unlawful under 42 U.S.C. § 1981 because it was racially motivated and also violated equal protection of the law. This equal protection claim has not been pursued and is deemed abandoned. It is also contended that the stop was improper because defendant was seized in violation of the Fourth Amendment, her luggage searched against her will, and she was arrested without probable cause. A memorandum was submitted in support of the motion (File Entry # 28).

Hearing was held on the motion to suppress and defendant submitted a post hearing memorandum (File Entry # 38). (*Id*). The United States filed a response (File Entry # 39).

The case has been referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on defendant's motion to suppress.

### Evidence

James Wetzel, an agent with the United States Customs Service, testified he had special training with regard to drug enforcement (Tr. p. 5) and that for the past 3½ years he has been assigned to the courier interdiction unit at the airport in Salt Lake City. His purpose is to look for couriers of narcotics and money as the proceeds of drug activity (Tr. p. 6). Flights from source cities are watched. These are flights from large cities on the border (Mexican border) or from California (*Id.*). The agent looks for persons who stand out such as those who pay cash or have a fast turn around flight (Tr. pp. 6–7). Wetzel was working at the Salt Lake City International Airport on October 9, 1996. He was working with detectives Paul Gardiner and Mike Judd. They monitored the arrival of Delta flight 324 which arrived at 8:50 p.m. from the Los Angeles International Airport. Wetzel's attention was drawn to a Hispanic female passenger who on leaving the airplane went in the opposite direction from baggage or information services (Tr. pp. 7–7). She came out of gate C–6 turned and walked towards gate C–7, stopped, turned around and looked back toward C–6 and down the concourse. She did not appear

nervous. She stood for a couple of minutes then walked past C–6. The officers followed the woman who was the defendant (Tr. pp. 8–9). She proceeded down the concourse to the luggage carts and rented one. She placed her bags on the cart. She then quickened her pace. The officers were in plain clothes. The defendant went through an airport screening device and went to an elevator when she readjusted her blouse and shirt. When she got off the elevator, she quickened her pace and went out the doors of the airport terminal (Tr. pp. 9–10).

After the defendant got to the curb across the street in the pickup area, Detective Gardiner made contact with the defendant. Agent Wetzel was a few feet behind and could hear the conversation. After a few questions, Gardiner handed Wetzel a cell telephone to call Detective Judd. The conversation with defendant was in English (Tr. p. 11). Detective Judd was called because he speaks Spanish and, in this case there might be a language problem, and apparently there was a problem because defendant did not appear to understand when she was asked for her airline ticket (Tr. p. 12). Judd came up and identified who he was and was told what the officers had done. He advised defendant she was not under arrest and she was free to go. Judd spoke to defendant, who didn't appear to understand, but then she appeared to relax (Tr. p. 12). The conversation was in Spanish. Officer Judd asked permission to search defendant's bags. Gardiner and Wetzel were present. Defendant's bags were searched (Tr. p. 13). In a larger bag, a half gallon container of lard was found. Wetzel took another bag, found a large bottle of shampoo with plastic bags in it. Wetzel believed it was narcotics based on his training. Gardiner also found a plastic bag in the tub of lard and asked the defendant what it was. She replied she did not know (Id). The bags were placed back together and Ms. Ruiz was asked to go to the officers office. Wetzel observed nothing that could be considered a threat. No weapon was displayed.

When defendant and the officers arrived at the office, Ms. Ruiz sat at a large table. Two other pieces of luggage which were kept at the office were placed with the defendant's luggage and a narcotics detection dog, Boone, was deployed on the bags. He gave a positive indication on the larger bag of defendant's. The two objects the officers had previously identified were taken out from the lard and shampoo. Other items, cream conditioners and baby powder, were removed and examined and a field test conducted (Tr. p. 15). The test was positive for amphetamine base. 959.6 grams were found in defendant's bags.

The defendant's flight was the first one checked by the officers that evening (Tr. p. 17). As soon as Agent Wetzel saw Ms. Ruiz, he decided to start observing her (Tr. p. 18). Racial characteristics are not particularly of concern (Id.). The agent identified the defendant in his report as an "Hispanic female." This was a matter of writing style. Defendant being Hispanic would possibly be of importance if coming from a source city, which occurred in this case (Tr. p. 19). No one else was stopped. The first thing that attracted the agent's attention was the way defendant turned in the different directions. The defendant's race[1] (ethnicity) possibly could have triggered the agent's interest (Tr. p. 19). The fact that defendant was alone, from a source city and walked in a different direction than most passengers was considered significant (Tr. p. 21). The defendant was wearing loose clothing. She was not walking stiffly or holding her stomach. She had three carry on bags. She did not see Agent Wetzel nor did she go to the bathroom (Tr. p. 22). She did not make a telephone call (Tr. p. 23). The defendant sped up once she obtained a luggage cart. There was no indication the defendant was "body packing" (Tr. p. 25). When Officer Gardiner spoke to defendant she was probably aware of Agent Wetzel's presence, although Officer Judd was at the baggage claim area (Tr. pp. 26–27). After Officer Judd arrived he conducted the inquiry of defendant in Spanish (Tr. p. 27).

A large amount of the attention the officers paid to defendant was because of the way she came off the airplane by walking in the opposite direction (Tr. p. 28). She stood

---

1. "Hispanic" is not a race. See Geyer, *Americans No More*, p. 222 (1996).

in the concourse for about two minutes (Tr. p. 29). It was as if she was looking to see if somebody was watching her or she was looking for someone.

Agent Wetzel said they saw a lot more drug couriers who were Hispanic from source cities (Tr. p. 30). He considered that of importance.

Officer Paul Gardiner, a Salt Lake City Police officer, testified that he was assigned to the DEA task force, airport interdiction unit. The Task Force often targets flights from source cities (Tr. p. 32). On October 9, 1996 he was working at the airport with Agent Jim Wetzel and Detective Mike Judd. He observed Delta flight 324 from LAX to Salt Lake City. Agent Wetzel came up and pointed out defendant and indicated what Wetzel had seen (Tr. p. 34). After defendant took a cart the officers merely observed her pass security and go on to an elevator, and out the front door and across the street to the restricted area (Tr. pp. 35–36).

When Officer Gardiner stopped the defendant he showed her his DEA credentials. He told Ms. Ruiz that Gardiner was a narcotics officer at the airport. Gardiner told defendant that she was not under arrest and was free to go at any time, that he just wanted to ask her a few questions. The defendant said "yes" in English (Tr. p. 36). No weapon was displayed. Wetzel was present. Gardiner asked the defendant if she had some identification and she produced a Utah driver's license. The officer examined the license and then returned it to the defendant (Tr. pp. 37–38). The defendant appeared to understand the questions. There was no hesitation on defendant's' part. The officer asked for an airline ticket. Defendant admitted she was traveling from Los Angeles and produced a Delta airlines ticket receipt (Tr. p. 38). The name on the ticket matched the name on the driver's license, Ana Ruiz. It was a one way ticket from LAX to Salt Lake City (Tr. p. 38). The ticket receipt was handed back to defendant. The officer asked if the bags were the defendant's and if she packed the bags and the defendant said yes. Gardiner asked Ms. Ruiz if he could search her bags. She looked at him and said nothing (Tr. p. 39). Gardiner then said "can I look inside your bags?" The defendant said "yes." Gardiner reached down for a bag and defendant said something in Spanish which Gardiner did not understand. Gardiner turned to Officer Judd who was standing a little way away and motioned for him to come over (Tr. pp. 39–40). Gardiner was concerned that Ms. Ruiz may have said she didn't want him to open the bags and wanted Gardiner to "make sure" (Tr. p. 40). Judd then spoke to Ruiz in Spanish. Gardiner could not tell what was said but Judd said Gardiner could make the search. There were two bags. He opened one, found a can of lard with a bag protruding through the lard. He pulled the bag out and asked Ms. Ruiz what it was, she replied in English that she didn't know. It appeared to the officer to be methamphetamine. He put the bag back in the lard and zipped up the bag (Tr. pp. 41–42). Agent Wetzel was also searching a bag and he located something that appeared to be drugs. Judd spoke to her and she followed the officers to their office. She had not been handcuffed or told she was under arrest (Tr. p. 42). No force or threats were used (Tr. p. 43). When they arrived at the office, Ms. Ruiz sat on a chair and for training purposes two other bags were brought out and a drug dog deployed. The dog indicated the presence of a controlled substance (Tr. p. 43). After a field test the defendant was told she was under arrest (Tr. p. 43).

When defendant was stopped she could not see the officer's weapon (Tr. p. 45). The encounter with Ms. Ruiz was about 9:00 p.m., it was dark but well lighted outside. There were many people outside. Ms. Ruiz understood the advice that she was not under arrest and was free to go (Tr. p. 46). The officer believed Ms. Ruiz understood what was being asked when she said "yes" to the question of whether the officer could look inside her bags (Tr. p. 49). Officer Judd was called in case there was any doubt. The time from when Gardiner first approached Ms. Ruiz to when Officer Judd came up and began speaking to her in Spanish was about three minutes (Tr. p. 52). The drug dog was trained by Gardiner, is a certified narcotics dog by POST (Police Officers Standards and

Training) and is certified in marijuana, cocaine, methamphetamine, and heroin (Tr. p. 54).

Officer Michael Judd of the Salt Lake County Sheriff's Office testified that he has been assigned to the airport for two years and was working at the airport on October 9, 1996 (Tr. p. 55). He was with Officer Wetzel and Gardiner. They watched the arrival of flight 324 from Los Angeles. Two different individuals on the plane caught Judd's attention. Later he had contact with Ana Ruiz (Tr. p. 56). The officer first observed Ms. Ruiz when she left the plane and turned to her left. Judd and Officer Wetzel looked at each other and Wetzel said he would follow her (Tr. pp. 57–58). Judd continued to watch the flight. Later he was called to the curbside location by Wetzel (Tr. p. 59). Judd approached the defendant and Officer Gardiner. He displayed his credentials to the defendant as he came alongside her. He smiled and told her they were police officers who worked narcotics at the airport. He told her she was not under arrest and was free to go. The conversation was in Spanish. Ms. Ruiz acknowledged she understood when asked by Judd if she did understand (Tr. p. 60). No weapon was displayed (Id.). Gardiner spoke to Judd, telling him what had occurred, and Judd asked Ms. Ruiz if they could search her bags. She said why? Judd asked if she had drugs with her and she said no. Judd asked "can we search your bags, with your permission" and she nodded her head and said "yes." Judd then told Gardiner and Wetzel they could go ahead. When Gardiner found the plastic bag in the tub of lard, he asked Ms. Ruiz what it was and she said she didn't know (Tr. p. 62). At one point, she told Judd she was from Utah (Tr. p. 63). Wetzel also found a bag in the shampoo container he was looking at. Judd asked if she wanted to go to the office and speak about it and Ms. Ruiz said yes (Tr. p. 63). No threats were made to her.

Ms. Ruiz' bags were placed on her cart and she pushed the cart to the office. On arrival at the office, she was not handcuffed and she sat down. She did not appear to want to leave but did appear nervous (Tr. pp. 63–64).

She watched the dog sniff, the items were retrieved from her bags and the drugs were field tested. They tested positive for methamphetamine (Tr. p. 64). Ms. Ruiz was told she was under arrest. She was given a *Miranda*[2] warning in both English and Spanish. The warning was read from a card. After each paragraph, she was asked if she understood and she said yes (Tr. p. 65). She acknowledged she understood when she was asked in Spanish (Tr. p. 66). Ms. Ruiz signed an explanation of rights and she asked for an attorney (Id.).

Officer Judd first said to Ms. Ruiz, when he spoke to her, that there was no problem. This was to calm her (Tr. pp. 68–69). The advice given her was standard advice and used by the other officers. Ms. Ruiz was free to leave if she had wanted to (Tr. p. 70). She raised no objection at any time.

The defendant Ana Bertha Ruiz testified. She flew into Salt Lake on October 9, 1996. She had done so at least four times before (Tr. p. 72). She went the wrong way in search of where there were not so many people. She exited the terminal, there were a number of people present. When an officer approached, he made a movement with his telephone and she saw his gun. He identified himself and asked for identification and she gave him her driver's license (Tr. p. 73). She understood the officer's question. She was afraid. She was not told she was free to leave and didn't have to answer questions (Tr. p. 74). Then a second officer arrived after several minutes. Officer Judd spoke to her but she did not understand. She did not feel free to leave (Tr. p. 75). When Officer Gardiner spoke to defendant, he spoke in English, he told her she was not under arrest and what his job was, but she didn't understand well. He did show identification (Tr. pp. 76–77). She understood Gardiner was a narcotics officer. Ruiz didn't understand everything (Tr. p. 77). She did tell him the bags were hers. The gun was not displayed and she was not threatened (Tr. p. 78). Officer Gardiner asked her if he could look in her bags. She does not remember if she responded "yes" in English (Tr. p. 78). Ms. Ruiz said when Judd arrived, Gard-

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

iner was already looking in the bags. Judd told her all three persons were narcotics officers, that she was not under arrest and was free to leave. Ms. Ruiz acknowledged to Judd she understood. Ms. Ruiz agreed to speak to Officer Judd (Tr. pp. 79–80). Judd asked if he could search her bags and she said "yes" (Tr. p. 80). When drugs were found, Ms. Ruiz was asked in English what it was and she said "I don't know." She agreed to go to the office with the officers. She observed them further search the bags. She gave the officers permission to search her bags (Tr. pp. 80–81). She felt she was "detained" when first approached but was told she was free to leave. Ms. Ruiz was 29 years old at the time and had lived in Utah for four years and in California before that. She was born in Mexico but has been in the United States for eight years. She took a test in English and Spanish for a Utah driver's license. She works for a clothing company in Magna, Utah (Tr. p. 83).

Based on the above evidence the court enters the following:

### Findings of Fact

1. On October 9, 1996 at about 8:30 p.m. three members of the Drug Enforcement Task Force were conducting airport courier interdiction surveillance at the Salt Lake International Airport. They were United States Customs Service, Special Agent Jim Wetzel; Salt Lake City Police Officer Paul Gardiner; and Salt Lake County Deputy Sheriff Michael Judd. The officers met airplanes arriving from drug source cities. The officers met Delta flight 324 from Los Angeles International Airport at 8:50 p.m. Los Angeles is a source city for drugs. The Drug Task Force attempts to interdict drug couriers. The officers look for unusual behavior of airline passengers.

2. The officers were alerted to the defendant when she disembarked from the Delta flight because she turned on the concourse in the opposite direction from the passenger flow to the baggage area and defendant walked towards a more distant station, turned and walked back. Agent Wetzel was also attentive to defendant because she was an Hispanic female and a number of drug couriers from source cities, in his experience, have been Hispanic. He had no evidence, indication or description that any person of a specific ethnicity would be transporting drugs.

3. The defendant was not stopped or seized by any officer. She went towards the airport entrance and stopped at a baggage cart stand and rented a cart for her three carry on bags. She placed the bags on the cart, went through the security check, and to an elevator. The defendant took the elevator to the main floor and went outside the airport terminal and across a roadway to a pickup area. The area was lighted and numerous people were present.

4. Officer Gardiner made contact with the defendant and Agent Wetzel was a few feet behind. Gardiner spoke to defendant in English. This was close to 9:00 p.m. but the area was well lighted. Gardiner did not touch or restrain defendant Ana Ruiz. He showed her his credentials and told Ms. Ruiz that he was a narcotics officer at the airport, that she was not under arrest, and that she was free to go at anytime. Gardiner said he wanted to ask defendant a few questions. Defendant said "yes" in English. Defendant understands English, but her primary language is Spanish. She was born in Mexico and has lived in the United States for eight years and has a Utah driver's license and is employed in Magna, Utah, a suburb of Salt Lake City. No weapon was displayed, although defendant may have seen the officer was armed. This had no impact on her. She was not frightened or nervous. Gardiner asked for some identification and defendant produced a Utah drivers' license. Gardiner examined the license and returned it to defendant. It was in proper order and in her name. She understood the questions Gardiner put to her. The officer asked for defendant's airline ticket which she produced. It showed travel one way from Los Angeles to Salt Lake City. The name on the ticket matched the name on defendant's driver's license, Ana Ruiz. The officer returned the ticket and license to the defendant. The officer asked if the bags Ruiz had were the defendants and she said they were. Gardiner asked if he could search the "bags."

The defendant said yes and Gardiner bent down for a bag when defendant said something to the officer in Spanish. He did not understand what was said. Gardiner contacted Officer Judd who speaks Spanish and asked him to come over. This was to make sure Ruiz had not objected to the search. Judd was a few feet away.

5. Judd walked alongside Ms. Ruiz. He displayed his credentials and addressed her in Spanish. At that time, the other officers, Gardiner and Wetzel, had not opened defendant's bags. Judd smiled at the defendant and told her they were police officers working narcotics at the airport. Judd said the defendant was not under arrest and was free to go. Judd asked the defendant if she understood and she acknowledged that she did. He displayed no weapon, made no threat, and did not touch defendant or direct her to move anywhere. Gardiner had informed Judd as to what had transpired before. Judd asked defendant if they could search her bags. She asked why? Judd asked if she had drugs and she said "no." Judd then asked if they could search her bags with her permission. Defendant nodded her head affirmatively and said "yes." Judd then told Officers Gardiner and Wetzel they could go ahead and search her bags.

6. Gardiner opened one bag and found a large tub of lard. He opened the lard can and inside found a plastic bag that appeared to contain methamphetamine. Agent Wetzel found a similar bag in a shampoo bottle. Gardiner asked defendant what was in the bag in the lard and she said she didn't know. Judd asked defendant if she wanted to go to the office and speak about it and she said "yes." The officers had probable cause to arrest defendant at that time. The officers and defendant went to the airport police office. Defendant's bags were put on the cart and she pushed the cart to the office.

7. At the police office the bags were subjected to a sniff by a trained narcotics dog that alerted positive for drugs. The bags were opened again and the drugs were removed. The drugs were field tested and proved positive for methamphetamine. Defendant was formally arrested.

*Discussion*

■ The defendant Ana B. Ruiz' motion to suppress (File Entries 27, 28) contends the defendant's rights under 42 U.S.C. § 1981 were violated because she was selected for investigation because of her ethnicity. The defendant has not repeated that argument in her post hearing brief but has addressed her ethnicity argument in the context of a challenge to the basis for any seizure of the defendant (File Entry # 38). 42 U.S.C. § 1981 was originally adopted by Congress immediately after the Civil War on April 9, 1866. It was enacted by virtue of the Thirteenth Amendment and was intended to rectify some of the disabilities of slavery. *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1879); *United States v. Harris,* 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290 (1883); *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872)(Act enacted to guarantee certain privileges and immunities to eliminate vestiges of involuntary servitude). "The Civil Rights Act of 1866 was the first federal statute to provide broad protection in the field of civil rights. Its purpose was to give the newly emancipated Negro equality with whites before the law." Bernard Schwartz, *Statutory History of the United States: Civil Rights* Vol. 1, p. 99 (1970). The original statute provided that persons "born in the United States, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as punishment for a crime where the party shall have been duly convicted, shall have the same right, in every state and territory in the United States, to make and enforce contracts, to sue, be parties and give evidence, to inherent, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens ..." The purpose of the original legislation was to promote equality it did not create or relate to political rights. Schwartz, *supra.*

In 1991 Congress reenacted the statute with amendments which expand on the limiting interpretive decision of the United States

Supreme Court in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The requirement of citizen standing was eliminated and the statute was modernized and expanded as to contractual rights. The essence of the statute in its relevant part is similar to the 1866 statute. The section now reads:[3]

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

The 1991 legislation expands in section (b) the rights protected with regard to employment. See § 2 of Publ. L. 102–166, November 21, 1991, 105 Stat. 1071. Congress provided that "no statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record § 15276 (Daily Rept. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of" the act. § 105(b) of Pub.L. 102–166. Thus, this court is not free to read into the statute something not intended by Congress or drawn beyond the plain meaning of the statutory language. The prohibited discrimination proscribed by the statute must concern one or more of the activities specifically enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085 (2d Cir.1993); *Thomas v. St. Luke's Health Systems, Inc.,* 869 F.Supp. 1413 (N.D.Iowa 1994) aff'd. 61 F.3d 908 (8th Cir.1995). The language of the statute and history of the section show it has no applica-

tion to the circumstances of this case unless there has been a seizure of the defendant in violation of § 1981. There was no interference with any of the statutory enumerated rights in this case, except possible with regard to "security" if there was otherwise a violation of rights. The provisions of the Fourth Amendment and 42 U.S.C. § 1983 have application to the alleged seizure of a person and the Fourth Amendment informs the issue in this case. *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

It must be acknowledged that some courts have found 42 U.S.C. § 1981 applicable in the context of a civil suit to police misconduct in detaining or arresting a person solely on the basis of race. *Grier by Grier v. Galinac,* 740 F.Supp. 338 (M.D.Pa.1990); *Melson v. Kroger Co.,* 550 F.Supp. 1100 (S.D.Ohio 1982); *Spriggs v. City of Chicago,* 523 F.Supp. 138 (D.Ill.1981). Without critically analyzing these pre 1991 cases, it is sufficient to note the cases did not consider the issue of suppression of evidence or dismissal of a criminal prosecution. They concerned a civil remedy and appear to be generous in the interpretation of § 1981 as distinct from 42 U.S.C. § 1983. The statute is not applicable to the relief sought in this case or to a situation where no seizure has occurred. The exclusionary rule sought to be applied in this case comes from the Fourth Amendment *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). 42 U.S.C. § 1981 does not have application to the issue of suppression of evidence, that remedy must be based on a constitutional violation of the Fourth Amendment. Cf. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). The remedy of suppression is one provided by judicial decision for protection of Fourth Amendment interests. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Congress has provided no such remedy under 42 U.S.C. § 1981. Defendant has cited no case for the proposi-

---

**3.** Defendant's original memorandum quoting the statute left out important parts of the new amended statute.

tion that 42 U.S.C. § 1981 provides a suppression remedy[4] or that a violation of 42 U.S.C. § 1981 requires suppression of evidence.

■ The court does agree with the defendant that general circumstances of a person's race or ethnicity are not a proper factor in determining reasonable suspicion or probable cause. Admittedly a number of drug traffickers in Utah are Hispanic. However, they are also white, black, native, and Asian. The overwhelming majority of Hispanics are not involved in drug trafficking or any other criminal endeavor. To stop and question on the basis of ethnicity alone is impermissible. *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)(Mexican ancestry of vehicle occupants did not provide reasonable suspicion they were illegal). See also *United States v. Alarcon–Gonzalez,* 73 F.3d 289, 292 (10th Cir. 1996); *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062 (7th Cir.1976)(INS may not stop and question persons as to their alienage merely because they are Mexican or have Spanish surnames); *United States v. Anderson,* 923 F.2d 450 (6th Cir.1991)("suspicions based solely on race of the person stopped cannot give rise to a reasonable suspicion justifying a *Terry* stop"). However, race may be a factor as to probable cause or reasonable suspicion if it matches a description of an offender or fits the facts relevant to a particular person, place, or circumstance of the offense. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Bautista,* 684 F.2d 1286 (9th Cir.1982); *United States v. Tehrani,* 49 F.3d 54 (2d Cir.1995). See Wayne R. LaFave, *Search and Seizure,* 3d Ed. Vol. 4 § 9.4(f) pp. 182–183 (1996). Consequently, defendant's Hispanic ethnicity cannot be considered a legitimate basis for any seizure of her person.[5] However, if defendant was not seized, there was no legal violation by Agent Wetzel that would justify suppression.

*Airport Encounter*

■ The defendant's position seems to be that when Officer Gardiner approached Ms. Ruiz and spoke to her he was required to have reasonable suspicion or probable cause. The court agrees with the defendant that at no time, from Gardiner's approach to defendant until she said to Officer Judd that the officers could look in her bags, did any officer or the combined officers have reasonable suspicion or probable cause to detain the defendant. Her conduct was fully consistent with innocence and did not come up to the required standard for a lawful seizure of defendant. *United States v. Lambert,* 46 F.3d 1064 (10th Cir.1995). However, that fact does not require the suppression of the evidence if the defendant was not "seized" within the meaning of the Fourth Amendment.

Not every contact between a citizen and an officer involves the Fourth Amendment. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). In *United States v. Shareef,* 100 F.3d 1491, 1500 (10th Cir.1996) the court said there are three categories of police citizen encounters:

> "(1) consensual encounters which do not implicate the Fourth Amendment ... (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity ... and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause."
> 100 F.3d p. 1500.

See *United States v. Davis,* 94 F.3d 1465, 1467–68 (10th Cir.1996); *United States v. Lang,* 81 F.3d 955, 964 (10th Cir.1996); *United States v. Little,* 18 F.3d 1499, 1504 n. 5 (10th Cir.1994). The court in *Shareef* said "These categories are not static. A consensual encounter may escalate into an investigative detention. An investigative detention may escalate into a full-blown arrest, or it may escalate into a consensual encounter."

---

4. The United States has not addressed this issue.

5. In this regard, it should be noted that only Agent Wetzel mentioned defendant's ethnicity as

relevant to his investigation. Officers Judd and Gardner did not mention it as a factor for their activity.

The initial contact of Officer Gardiner with Ms. Ruiz was consensual. Gardiner did not physically stop defendant or order her to remain. Defendant was never touched. See *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Gardiner asked if he could speak to the defendant. He identified himself as a narcotics officer at the airport. He told defendant she was not under arrest and could leave. He said he wanted to ask Ruiz a few questions and she responded in English, "yes." Gardiner asked for identification and defendant presented a Utah driver's license. An airline ticket was requested and examined. Both documents were returned without further questions being asked about them. The return of a driver's license or identification provides a basis to conclude that there was no involuntary detention of the defendant by holding her documents. It was a consensual police citizen encounter. *United States v. Shareef*, 100 F.3d at 1501 (return of license is no longer detention of a driver unless there is an otherwise objective belief that one may not leave); *United States v. Werking*, 915 F.2d 1404, 1408–09 (10th Cir.1990); *Lambert, supra; United States v. Turner*, 928 F.2d 956, 959 (10th Cir.1991); *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir.1996).

The defendant expressed no hesitation as to Officer Gardiner's request. Gardiner asked defendant if the bags were hers and did she pack them and she quickly responded "yes". There was nothing at this point that went beyond a police/citizen encounter. It did not implicate the Fourth Amendment. *United States v. Sanchez*, 89 F.3d 715 (10th Cir.1996).

Gardiner asked defendant if he could search her bags. Defendant said nothing and Gardiner asked again. Defendant said "yes" and Gardiner moved towards the bags and defendant made a statement in Spanish. Gardiner did not speak Spanish but contacted Officer Judd who was a few feet away and who speaks Spanish. He responded. Gardiner asked Judd to come over and speak to Ms. Ruiz because Gardiner wasn't sure she had said something in Spanish that was contrary to Ruiz' prior consent to look in her bags. Gardiner wanted to make sure.

Judd walked alongside and didn't touch or direct a command to Ruiz. Judd identified himself and again defendant was told the officers were working narcotics at the airport. Judd told defendant again that she was not under arrest and was free to go. She could have left at that time and, according to the evidence, would not have been restrained. Ruiz acknowledged that she understood the advice. She was, therefore, fully aware that she could not be compelled and her continuing to remain was voluntary. Judd asked if they could search her bags and Ruiz asked "why?" Judd asked if she had drugs and she said "no." Judd then said could they search her bags "with her permission." Ruiz responded "yes" and affirmatively nodded her head.

■ The determination of whether a suspect has been detained or whether there is a mere consensual encounter is to be viewed objectively as to whether a reasonable person would believe they were free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *United States v. Lambert, supra*. "If the individual is free to leave at any time during the encounter, he or she is not seized under the Fourth Amendment." *United States v. Hernandez*, 93 F.3d at 1498. "Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* The situation must be objectively assessed. *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 2388–89, 115 L.Ed.2d 389 (1991). There is no requirement for an officer to give a specific warning to a person that he or she is free to leave, *Ohio v. Robinette*, —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), although it was done in this case.

The defendant did not contest the voluntariness of her consent to search in her motion to suppress. (See File Entries 27, 28). Defendant attempts to raise the matter somewhat obscurely in her final reply brief (p.34).

In *United States v. Griffin*, 7 F.3d 1512 (10th Cir.1993) an airport encounter with a

drug officer and suspects involved the officer asking permission to search the suspects' luggage. The officer had previously examined the suspects' tickets. The two suspects agreed to accompany the officer during the search. Relying on *Florida v. Bostick*, supra, 501 U.S. at 435, 111 S.Ct. at 2386–87 the court said:

> An officer's request for consent to search personal luggage does not taint an otherwise consensual encounter "as long as the police do not convey a message that compliance with their request is required."

In *Bostick*, supra, the court referred to *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) at 501 for the proposition that a request to search does not necessarily become a seizure. See 501 U.S. at 435, 111 S.Ct. at 2386–87. In *Bostick*, 501 U.S. at 434, 111 S.Ct. at 2386, the court said:

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may he conclude that a 'seizure' has occurred.

In *United States v. Little*, 18 F.3d 1499 (10th Cir.1994) the *en banc* Tenth Circuit Court of Appeals addressed the nature of a police/train passenger encounter when the officer asked to search the passenger's bag. The question was whether the encounter was consensual. The court noted the test was objective. *Id.*, 18 F.3d at 1503. The court stressed the issue must be determined from the "totality of the circumstances presented." *Id.* p. at 1503. See also *United States v. Lambert*, supra; *United States v. Sandoval*, 29 F.3d 537 (10th Cir.1994). The court said "[t]he asking of incriminating questions is irrelevant to the totality of the circumstances of the encounter." *Little*, 18 F.3d at p. 1506. The court did not resolve the detention issue but remanded it to the trial court to apply proper standards.[6]

■ In *United States v. Carhee*, 27 F.3d 1493 (10th Cir.1994) the court discussed an airport stop and search. The court held the circumstances did not exceed a consent police citizen encounter. Referring to *Bostick*, supra, the court quoted the following language:

> "[T]he Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate." [quoting 501 U.S. at 431, 111 S.Ct. at 2384–85]. 27 F.3d at p. 1493.

Therefore, there was no detention of defendant by the request to search her bags. Whether a detention has occurred is to be determined by examination of the totality of the circumstances. *United States v. Davis*, 94 F.3d 1465, 1469 (10th Cir.1996); *United States v. Shareaf*, supra, *United States v. Lang*, 81 F.3d 955, 964 (10th Cir.1996). The circumstances here show there was no detention of the defendant up to and including the search of her bags.

■ The defendant suggests the search was not voluntary because no warning of the right to refuse the request was given to her. The advice that defendant could leave at anytime and the request to look "with her permission" would clearly have conveyed the fact that defendant's further compliance with the officer's request would have to be voluntary. Even so, no warning is required as a prerequisite to a consent search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Fernandez*, 18 F.3d 874 (10th Cir.1994); *United States v. Sanchez–Valderuten*, 11 F.3d 985 (10th Cir.1993). See also in a different context but citing to *Schneckloth*, *Ohio v. Robinette*, —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)(no warning or advice required in a police/citizen encounter). The defendant's consent to search, based on the totality of the circumstances in this case was voluntary. *Schneckloth*, supra; *United States v. Zapata*, 997 F.2d 751 (10th Cir. 1993); *United States v. Ray*, 973 F.2d 840 (10th Cir.1992); *United States v. Price*, 925 F.2d 1268 (10th Cir.1991).

## Opening Defendant's Bags

■ When defendant gave consent to search her bags, they were opened at that

---

6. After remand, the district court held that under the totality of the circumstances of that case, detention occurred. The Court of Appeals held

persistent intrusive questioning could be relevant to detention. *United States v. Little*, 60 F.3d 708 (10th Cir.1995).

time and the methamphetamine found. At that point the defendant's expectation of privacy in the contents of the bags ·and the methamphetamine ended. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (warrantless requisitioning and re-opening of package). "No protected privacy interest remains in contraband in a container once Government officers lawfully have opened that container and identified its contents as illegal. The simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive and restore the lawfully invaded privacy rights." (*Id.*). In *Andreas* the court analogized the situation to the plain view doctrine. See also *United States v. Butler*, 904 F.2d 1482, 1485 (10th Cir.1990); *United States v. Andrews*, 618 F.2d 646, 649 (10th Cir.1980); *United States v. Ford*, 525 F.2d 1308 (10th Cir.1975); *United States v. DeBerry*, 487 F.2d 448 (2d Cir.1973); LaFave, *Search and Seizure*, 1 3rd Ed. § 5.5(e)(1996); Hall, *Search and Seizure*, 2d Ed. § 29:15 (1993). Once the contents of the bags were disclosed, the zippering them back up did not reestablish a right of privacy. Defendant no longer had a reasonable expectation of privacy in her bags. *Andreas*, supra. *United States v. Walsh*, 791 F.2d 811 (10th Cir.1986)(expectation of privacy lost on airline employee opening bag).

*United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)[7] relied on by defendant is not applicable because in that case the bag that was seized had not been previously opened. It was not opened by consent or reasonably incident to defendant's arrest. In this case the defendant never withdrew her consent and the bags had been previously opened with consent, vitiating the defendant's further claim of privacy. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (what a defendant volun-

tarily exposes to the public view cannot be claimed as subject to a reasonable expectation of privacy).[8]

In addition the second opening of the bags is also justifiable incident to defendant's lawful arrest when she was asked to accompany the officers to the police office and was kept there. See *United States v. Bell*, 892 F.2d 959 (10th Cir.1989)(airport stop, drugs disclosed after dog sniff and package opened at airport police office after defendant was arrested and taken to the office). See also *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). The drugs were properly obtained and are admissible in evidence.

### Conclusion

The motion to suppress of defendant Ana Ruiz should be denied.

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

---

7. Also *United States v. Donnes*, 947 F.2d 1430 (10th Cir.1991).

8. Also, any post encounter detention of defendant, which occurred after the initial consent search was based on probable cause *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and was lawful. The subsequent dog sniff of the bags which was conducted for "training purposes" merely provided further probable cause. It was otherwise irrelevant to the question of opening the bags.