**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Franco Antonio ALARCON–GONZALEZ,
Defendant–Appellant.**

No. 95–1209.

United States Court of Appeals,
Tenth Circuit.

Jan. 4, 1996.

Charles Szekely, Assistant Federal Public Defender, Denver, Colorado (Michael G. Katz, Federal Public Defender, with him on the brief).

Gregory C. Graf, Assistant U.S. Attorney, Denver, Colorado (Henry L. Solano, U.S. Attorney, with him on the brief).

Before BRISCOE, SETH, and LUCERO, Circuit Judges.

BRISCOE, Circuit Judge.

Franco Antonio Alarcon–Gonzalez entered a plea of guilty to reentering the United States after deportation for a felony conviction (8 U.S.C. § 1326(a) and (b)(1)), but reserved the right to appeal the order of the district court denying his motion to suppress evidence. He contends the questioning by Immigration and Naturalization Service (INS) agents that led to his arrest was a seizure unsupported by reasonable suspicion. We agree, and reverse and remand with directions.

Alarcon–Gonzalez, a native and citizen of El Salvador, was convicted of sale and transportation of cocaine in California in 1993, and was deported to El Salvador. INS agents arrested Alarcon–Gonzalez on November 28, 1994, while he was working as a roofer on a job site in Aurora, Colorado.

Aurora building code inspectors had informed INS that they suspected several roofing companies working in the city had employed illegal aliens because the inspectors had encountered roofers who did not speak English or who spoke with an accent. The inspectors provided a list of those companies to INS. INS was also informed that some vehicles at the job sites had Texas license plates. INS agents regarded this as a factor indicating the presence of illegal aliens because after a major hail storm in 1991, several local roofing companies had hired illegal aliens whose vehicles had Texas plates.

INS planned "Operation Shingle," in which teams of INS agents and Aurora police officers would contact roofing companies in the area to determine if they were employing illegal aliens. INS did not limit the scope of its investigation to the list of roofing companies provided by the Aurora building inspectors. The teams were instructed to go to job sites and ask foremen for permission to speak to workers about their immigration status. Agents were instructed to speak to all workers regardless of apparent nationality or ethnicity and to make no further inquiry if a foreman refused permission or a roofer refused to answer questions. "Operation Shingle" teams contacted approximately 60 people on November 28, 1994, and arrested 31, all of whom were Hispanic in appearance.

On the morning of November 28, an "Operation Shingle" team saw Alarcon–Gonzalez and another man, Cesar Carcamo–Perez, standing by a truck in the driveway of a

home that was being reroofed.[1] The company named on the side of the truck, "CLM Roofing," was not a company included in the list of roofing companies the Aurora building inspectors had given to INS. The team stopped its two INS vehicles and one Aurora police patrol car, and four to eight armed and uniformed team members got out and approached the two men.

Carcamo–Perez was reaching into the truck to unload a shingle gun. Apparently believing it to be a weapon, one of the team members commanded Carcamo–Perez to "freeze," and he complied. Alarcon–Gonzalez understood the command to be directed at Carcamo–Perez, but did not feel free to leave; he was only five feet away from Carcamo–Perez. INS agents approached and asked Carcamo–Perez to put the equipment down, which he did, slowly. An agent asked Carcamo–Perez if it was an item that he would normally use while roofing. Agents then identified themselves and asked Carcamo–Perez and Alarcon–Gonzalez about their immigration status. Carcamo–Perez and Alarcon–Gonzalez replied they were from El Salvador and that their documents were at home. The agents called in a records check, which revealed that Alarcon–Gonzalez had previously been deported and had not sought permission to reenter the country. Both men were arrested and taken to the INS office. The officers did not draw their weapons at any time, and there was no evidence that they touched either Alarcon–Gonzalez or Carcamo–Perez until they were placed under arrest.

In denying the motion to suppress, the district court rejected Alarcon–Gonzalez's argument that the command to "freeze" converted the encounter into an unconstitutional seizure, holding it was a justified response to a perceived threat to safety and a mere de minimis intrusion into the personal liberty of Alarcon–Gonzalez and Carcamo–Perez. The court also concluded the police encounter with Alarcon–Gonzalez was based on reasonable suspicion that he was involved in criminal activity.

In an appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the government and we review the district court's findings of fact only for clear error. However, the court's conclusions as to when a seizure occurred and whether it was supported by reasonable suspicion are reviewed de novo. The ultimate determination of reasonableness under the Fourth Amendment is also reviewed de novo. *United States v. Carhee*, 27 F.3d 1493, 1496–97 (10th Cir.1994).

Alarcon–Gonzalez contends he was subjected to a Fourth Amendment seizure when one of the team yelled "freeze" as the team approached and asked Carcamo–Perez and Alarcon–Gonzalez about their immigration status. The government argues the encounter was consensual and did not implicate the Fourth Amendment at all.

The district court did not hold that the encounter was consensual. The court ruled the command to "freeze" was a de minimis intrusion on personal liberty that did not convert the encounter into an unconstitutional seizure, and concluded there was reasonable suspicion for the brief questioning of Alarcon–Gonzalez.

The government's argument that the questioning that followed the command to "freeze" was consensual is without merit. A brief police encounter with an individual can be a detention under the Fourth Amendment if "the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). A seizure occurs when consideration of all the circumstances surrounding the encounter shows that the police conduct would have communicated to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. *Florida v. Bostick*, 501 U.S. 429, 434, 439, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991);

---

**1.** The record does not establish whether the truck had Texas plates. At oral argument, counsel stated photographs of the truck were admitted into evidence, which indicated the truck had Colorado plates. These photographs were not included in the record on appeal.

*United States v. Lambert*, 46 F.3d 1064, 1067–68 (10th Cir.1995). Although a Fourth Amendment seizure does not occur simply because a police officer approaches an individual and asks a few questions, that was not what occurred here.

■ The team may not have intended the questioning to be a nonconsensual detention or seizure, but consideration of all the circumstances compels the conclusion that a reasonable person in Alarcon–Gonzalez's position would not have felt free to leave after the approach of four to eight armed and uniformed police officers and INS agents and the command to "freeze." An order to freeze communicates that suspects are not free to leave and is sufficient to effect a seizure. *See United States v. Stanley*, 915 F.2d 54, 56 (1st Cir.1990). A command by a police officer to "freeze" is intimidating. It carries with it an implied threat to use force if the command is disobeyed.

Although Alarcon–Gonzalez knew the command to "freeze" was directed at Carcamo–Perez, he did not feel free to leave. The two roofers were only five feet apart, and were obviously working together. Under these circumstances, the command would communicate to both persons that they were not free to terminate the encounter. *See United States v. King*, 990 F.2d 1552, 1556 (10th Cir.1993). A reasonable person in Alarcon–Gonzalez' position would not have believed he was free to leave. The questioning that followed the command was not the result of a consensual encounter, but a seizure. *Delgado, supra*, is distinguishable because in that case the workers questioned were given no reason to believe the agents were restricting their freedom in any significant way. The agents in *Delgado* did nothing as coercive and intimidating as the command to "freeze" in this case.

■ Alarcon–Gonzalez contends his detention for questioning about his immigration status was not supported by reasonable suspicion, and he argues he was detained and questioned solely because of his Hispanic appearance. The government argues that Alarcon–Gonzalez was questioned because he was a roofer, which, with the information known by INS, provided reasonable suspi-

cion that Alarcon–Gonzalez was an illegal alien. The district court found that the officer who yelled "freeze" reasonably believed Carcamo–Perez was reaching for a weapon. Alarcon–Gonzalez argues that in the absence of evidence describing the shingle gun, there is no basis for determining the reasonableness of the officer's belief that the tool was a weapon.

However, whether or not the command to "freeze" was justified is immaterial because its effect was to turn the encounter that followed into a nonconsensual seizure. It must have been obvious that Carcamo–Perez had a roofing tool and not a gun when the questioning began. Agent Castillo described it as "equipment" and "a large staple gun," and did not question Carcamo–Perez further about it after asking him if it was a roofing tool. Following the command to "freeze," the agents did not say or do anything to communicate to Carcamo–Perez and Alarcon–Gonzalez that they were free to go, or otherwise attempt to undo the effect of the command to "freeze." Instead, they immediately began questioning the two men about their immigration status. *See United States v. Gonzalez*, 763 F.2d 1127, 1133 (10th Cir.1985) (consent to search given by detained driver after grounds for detention had dissipated held invalid where officer did not inform driver he was free to leave before obtaining consent). *Cf. United States v. Werking*, 915 F.2d 1404, 1408–09 (10th Cir.1990) (continued questioning after officer terminated detention by returning driver's license and registration was consensual).

■ The initial concern that Carcamo–Perez might have a gun could not justify an investigatory detention for questioning about immigration status. An investigatory detention must be reasonably related in scope to the circumstances which justified the stop in the first place. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1574–75, 84 L.Ed.2d 605 (1985); *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968). The concern about a gun was completely dispelled before the questioning began. Once the reason that justified the initial stop is dispelled, further detention un-

supported by reasonable suspicion violates the Fourth Amendment. *See United States v. McSwain,* 29 F.3d 558, 561–62 (10th Cir. 1994).

■■■ The determinative issue is not whether the command to "freeze" was justified, but whether there was reasonable suspicion to detain Alarcon–Gonzalez and Carcamo–Perez for questioning about their immigration status. Facts insufficient to establish probable cause may establish reasonable suspicion. A fair probability that contraband or evidence of a crime will be found is therefore unnecessary. However, the police must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. There must be some minimal level of objective justification. *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989).

■■■ Only in stops at fixed checkpoints is some amount of individualized suspicion not required for a brief investigatory detention. *See United States v. Massie,* 65 F.3d 843, 847 (10th Cir.1995). Otherwise, there must be a reasonable and articulable suspicion that the person seized is engaged in criminal activity. Based on the totality of the circumstances, the detaining officers must have a particularized and objective basis for suspecting the person stopped of criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), *cert. denied* 455 U.S. 923, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982); *Lambert, supra,* at 1069.

Here, the totality of the circumstances gave the INS agents a reasonable basis for suspecting that some roofers might be illegal aliens, but did not give them a reasonable basis for suspecting that Alarcon–Gonzalez in particular might be one of them. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (apparent Mexican ancestry of occupants of car did not provide reasonable suspicion that they were illegal aliens).

The INS agents themselves did not believe the information they had about illegal aliens employed as roofers was sufficient to justify detaining all roofers of Hispanic appearance for questioning on their immigration status. They intended all encounters with roofers to be consensual. An unusual combination of circumstances simply turned this encounter into a seizure. There was nothing whatsoever that could give the INS agents a reasonable basis for suspecting that Alarcon–Gonzalez in particular might be an illegal alien. There was no visible criminal activity. Neither Alarcon–Gonzalez nor Carcamo–Perez did anything that could have suggested he was an illegal alien or was otherwise engaged in criminal activity. The officer's belief that Carcamo–Perez was reaching for a weapon was dispelled before the questioning began, and there is nothing at all suspicious about a roofer unloading a roofing tool from a truck at a job site.

Working as a roofer is totally consistent with innocence. There was no evidence of any objectively suspicious act by Alarcon–Gonzalez. *Compare United States v. Ledesma–Dominguez,* 53 F.3d 1159 (10th Cir.1995) ("masking odor" typically used by drug smugglers supported stop of vehicle), with *United States v. Fernandez,* 18 F.3d 874, 878–81 (10th Cir.1994) (no reasonable suspicion; no masking odor, evasive action, or other objective indication of contraband). There was no evidence that either Alarcon–Gonzalez or Carcamo–Perez was visibly nervous or gave a false name. *Compare Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980), with *Sokolow, supra,* and *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983). Nor was there evidence that they attempted to hide or escape when approached by the "Operation Shingle" team, or that they displayed anger or disgust when they were detained. *Compare United States v. Lopez–Martinez,* 25 F.3d 1481 (10th Cir. 1994), and *United States v. Martin,* 15 F.3d 943, *aff'd on reh'g* 18 F.3d 1515 (10th Cir.), *cert. denied* —— U.S. ——, 115 S.Ct. 187, 130 L.Ed.2d 121 (1994), with *Fernandez,* 18 F.3d at 878–81. Because there was no visible criminal activity or any objectively suspicious act or circumstance, we conclude the detention of Alarcon–Gonzalez was not supported by reasonable suspicion. *See Reid, supra,*

448 U.S. at 440, 100 S.Ct. at 2753–54; *Lambert, supra,* at 1069–70.

REVERSED and REMANDED with directions to vacate Alarcon–Gonzalez's guilty plea.

SETH, Circuit Judge, concurring:

I concur in the reversal and remand of this case as ordered by the majority. I would, however, place the reversal on the following:

This encounter took place in a residential area of Aurora, Colorado, in a driveway leading from the street to a house set back from the street. Apparently there were no other persons present except the officers, the Defendant, and Defendant's fellow worker. Defendant was helping to unload a roofing company truck. There were four to six officers who had come up the street to the driveway in what were obviously two police cars and three Immigration and Naturalization Service cars. The police officers were in uniform and were obviously armed. The group of officers made up what was a "team" created to interrogate men working in the area as "roofers." The team connotes a cohesive group, each member with a function, with all to act together. This is the "team" which walked up the driveway toward the Defendant. It must be considered to have been a "show of authority." It must have been a threatening presence. This must be taken together with the shout by an officer in the team of "freeze" intended to be directed to the person (not the Defendant) who had his hand in the truck removing a stapling device which looked like a handgun but was soon recognized as a harmless tool.

Taking all the circumstances together there was no consensual encounter at the outset but instead was an intimidating challenge by the "team" by its appearance, number, movements, arms, uniforms and the verbal challenge. When the group arrived a question was asked about the tool, directed to Defendant's fellow worker. No answer was received. The record states that the team captain "introduced" himself, but the record does not reveal how warmly this "introduction" was received. The questions then began apparently with all the above mentioned present.

The Supreme Court in the several opinions wherein the "reasonable person" doctrine as to seizure has been applied as discussed presents an unusual number of separate opinions in each case. For example, in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), there are five opinions. *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), was the first majority opinion using the doctrine. However, the number of separate opinions do not necessarily conclude that different dispositions be made.

In these opinions there are recurring terms which include the consideration of a "show of authority," "the threatening presence of a number of officers," "weapons," "intimidation", "an order to halt," "uniforms," and generalities as to location. "Circumstances of the encounter are so intimidating" and use of language or tone of voice indicate that compliance might be compelled.

In considering the "totality of the circumstances" the impact of these listed conditions, if present, is examined, *together with* the question whether police conduct itself, when communicated to a reasonable person, would cause such a person to feel free to leave, to feel no need to respond or cooperate, or to feel that he could terminate the encounter.

The location where the encounter took place or continued is always a factor. Per se consequences as to certain locations have been excluded. *See Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), as to bus passengers. Also, our court in an en banc opinion excluded what was developing to be a per se rule as to encounters in passenger train roomettes or compartments. *United States v. Little,* 18 F.3d 1499 (10th Cir.1994).

Any per se rule is obviously gone, but the "reasonable person" doctrine is still alive and well although there may have been mentioned a new definition of "seizure," which may only be one of semantics, but indicates a more physical aspect. *See Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). We apply *Little,* however, because we have no physical seizure here. We consider *United States v. Ward,* 961 F.2d

1526 (10th Cir.1992), *United States v. Bloom,* 975 F.2d 1447 (10th Cir.1992), and *United States v. Zapata,* 997 F.2d 751 (10th Cir. 1993), after the impact of the *Little* holding. It is apparent that in those "train encounter cases," the fact that the incident took place in a roomette or compartment cannot be a determinative factor. As mentioned, the train opinions were approaching a per se rule. *United States v. Dimick,* 990 F.2d 1164 (10th Cir.1993). The *Little* en banc opinion made it clear that all factors and circumstances surrounding an encounter must be considered without any single one being a determinative factor, relying on and quoting *Bostick* and citing *Bloom.* *Bloom* held that the particular place of the encounter is but one factor in the totality of the circumstances. In *Little* the court stated:

> "Just as *Bostick* explicitly rejected any categorical distinctions based on the location of a police-citizen encounter on a bus (inside the bus, outside the bus, or in the bus terminal lobby), so, too, we reject the argument that the location of an encounter on a train (outside the train, in a public coach, or in a private roomette) is determinative of the seizure question. Any implication to the contrary from our previous opinions is overruled."

18 F.3d at 1504 (footnote omitted). Citing *Bloom,* 975 F.2d at 1453, n. 6, the *Little* court noted that again the basic question was "whether a reasonable person would believe that he or she is unable to terminate the encounter." 18 F.3d at 1505. The *Little* court then held that the trial court was in error because it "apparently gave determinative weight to both the roomette setting and the failure to specifically advise Ms. Little that she need not answer questions...." 18 F.3d at 1506.

The court in *Little* did not decide whether a private place should be distinguished from a public place, but only rejected the train roomette as the reason for a distinction. *Little* cited *Bostick* on this point, and stated:

> "*Bostick* explicitly held that the particular location of an encounter is but one factor in the 'totality of the circumstances'

test '[w]here the encounter takes place is one factor, but it is not the only one.'" 18 F.3d at 1503.

Justice Powell, concurring in the result in *Delgado,* stated that "the systematic and public nature of the [factory] survey serve[d] to minimize any concern or fright on the part of the lawful employees." 466 U.S. at 224, 104 S.Ct. at 1767. The Supreme Court in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a *Miranda* case, considered the importance of an encounter in a public place in the "reasonable person" analysis. A "public place" is of course a place where the individual is in the view of persons other than the officers. In *Zapata,* we stated specifically and as of general application:

> "We consider a number of factors in determining whether a police-citizen encounter becomes a seizure; the location of the encounter, particularly whether the defendant is 'in an open public place where he [is] within the view of persons other than law enforcement officers,' *Ward,* 961 F.2d at 1531; ...."

997 F.2d at 756. This was not changed by *Little.* *See also* Justice Powell concurring in the result in *Delgado.* The private place compared to a public place was held to be a factor in *United States v. Ray,* 973 F.2d 840 (10th Cir.1992), and *United States v. Ward,* 961 F.2d 1526 (10th Cir.1992).

In my view, the location where the encounter here took place is entirely different from that in *Delgado,* and so different that it must be a factor of importance to be added to the entire circumstances.

In my view, when all the circumstances are considered together it appears that there was no consensual encounter at the outset. Instead, there was a challenge by the presence of the team, its actions and the shouted command in a "private place" as the term is used in the above opinions. There is nothing to demonstrate that the original circumstances changed before or during the questioning. Thus there was a "seizure" when the reasonable person doctrine is applied.

I would order on remand to the trial court that Defendant's Motion to Suppress be

granted, and that he be allowed to withdraw his guilty plea.