*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0300P (6th Cir.)
File Name: 03a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

MARIO JOAQUIN VITE-
ESPINOZA (02-5491); JOSE
MARTINEZ-RIVERA (02-5492),
*Defendants-Appellants.*

Nos. 02-5491/5492

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00112—Todd J. Campbell, District Judge.

Argued: October 15, 2002

Decided and Filed: August 25, 2003

Before: BOGGS, SUHRHEINRICH, and CLAY, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Sumter L. Camp, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, Paul J.
Bruno, BRUNO, HAYMAKER & HEROUX, Nashville,

Tennessee, for Appellants. Hilliard H. Hester, ASSISTANT
UNITED STATES ATTORNEY, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Sumter L. Camp, FEDERAL
PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, Paul
J. Bruno, BRUNO, HAYMAKER & HEROUX, Nashville,
Tennessee, for Appellants. Hilliard H. Hester, ASSISTANT
UNITED STATES ATTORNEY, Nashville, Tennessee, for
Appellee.

BOGGS, J., delivered the opinion of the court, in which
SUHRHEINRICH, J., joined. CLAY, J. (pp. 14-21),
delivered a separate opinion concurring in the outcome
reached by the majority.

———————

## OPINION

———————

BOGGS, Circuit Judge. Defendants Mario Joaquin Vite-
Espinoza and Jose Martinez-Rivera appeal the district court's
denial of their motion to suppress, on Fourth Amendment
grounds, firearms found in their possession and statements
they made as they were taken into custody. A joint federal,
state, and local police task force investigating the
counterfeiting of immigration and identification documents
executed a valid federal search warrant on a house in
Springfield, Tennessee, owned and occupied by a third party.
During the course of that raid, the defendants were found
outside the house, but on the premises. It emerged that the
defendants were aliens illegally in this country, the police
discovered a concealed handgun on Martinez-Rivera and
another concealed handgun in Vite-Espinoza's truck in the
house's driveway, and the defendants were taken into custody
of the Immigration and Naturalization Service ("INS"). After
denial of their motions to suppress the handguns, each
defendant pleaded guilty to being an illegal alien in
possession of a firearm, in violation of 18 U.S.C.

§ 922(g)(5)(A), but reserved the right to appeal the district court's denial of the motion to suppress. It is this appeal that is now before the court. We affirm.

**I**

On July 5, 2001, following up on intelligence that the house was being used to produce and sell counterfeit immigration documents and social security cards, as well as deal large quantities of marijuana, the United States Secret Service retrieved trash left for collection outside the house. In the trash were found "stems, seeds and remnants of marijuana" and Mexican birth certificates. On this evidence, a federal search warrant was issued for the house. Prior to execution of the warrant, the law enforcement agents involved, about fifteen officers from the INS, the Secret Service, and Tennessee state and local police agencies, agreed to question all persons found on the premises regarding their immigration status, on the basis that persons found in a location where counterfeit immigration documents are dealt could reasonably be suspected of being illegal aliens, and to perform *Terry* stops-and-frisks, on the basis that persons involved in drug deals are frequently armed and dangerous.

The police raided the house and executed the search warrant that same day. Four men and a woman, among them the defendants, were found in the back yard of the house and immediately handcuffed and patted down. The pat-down of Martinez-Rivera uncovered a handgun in his waistband. Vite-Espinoza's search uncovered no weapons, but the officers took documents and a billfold from his pocket. Upon questioning, both Vite-Espinoza and Martinez-Rivera admitted to being in the country illegally. The officers also found another handgun lying on the ground, which another of the men present admitted dropping. At this point, the officers decided to search the vehicles in the driveway of the house. Under the floorboard of a truck owned by Vite-Espinoza, the police discovered another handgun, which Vite-Espinoza

admitted to owning. The defendants were taken into custody by the INS. James Grant, a Tennessee Highway Patrol officer assigned to the raid, determined that Vite-Espinoza's truck was leased and that other vehicles on the premises also registered to Vite-Espinoza had title and licensing irregularities. Grant impounded the truck, took an inventory, and returned it to the lien-holder. The search of the house itself uncovered "several identification documents, [a] Polaroid camera, a typewriter, . . . large quantities of ammunition, . . . blank Mexican birth certificates," and more marijuana remnants, but no bulk marijuana.

On July 25, 2001, the defendants were indicted for being illegal aliens in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A), possession of false social security cards, in violation of 18 U.S.C. § 1028(a)(6), and using false social security numbers, in violation of 42 U.S.C. § 408(a)(7)(b). After arraignment and unsealing of the search warrant, the defendants moved to suppress the firearms, on the grounds that the guns were seized without a warrant or an applicable warrant-requirement exception. They also moved to suppress their statements incident to arrest, on the ground that they were products of the unconstitutional seizure. The district court denied the motions to suppress, finding that while the defendants and the truck were not covered by the search warrant and there was insufficient evidence that the defendants had consented to the search, the police performed a valid *Terry* stop-and-frisk on the defendants and the gun in the truck would inevitably have been discovered pursuant to an inventory search of the truck following its impoundment under a Tennessee statute. Subsequently, the defendants pleaded guilty to the firearms charge in return for a dismissal of the other charges, but reserved their right to appeal the denial of their motions to suppress. Vite-Espinoza was sentenced to ten months of incarceration, followed by two years of supervised release, and Martinez-Rivera to twelve months of incarceration, also to be followed by two years of supervised release. Both timely appealed the denial of their

motions to suppress to this court and we consolidated their appeals.

## II

The generally applicable principles of search and seizure jurisprudence are well-known and settled. The United States Constitution bars "unreasonable searches and seizures." U.S. Const. amend. IV. A stop for questioning is reasonable if the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" as measured by an objective standard. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Moreover, when the officer is "justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others." *Id.* at 26-27. In finding reasonable suspicion, "the totality of the circumstances–the whole picture–must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

The exclusionary rule bars the admission of items seized during an unconstitutional search, *Weeks v. United States*, 232 U.S. 383, 398 (1914), and of testimony concerning knowledge acquired during such a search, *Silverman v. United States*, 365 U.S. 505, 509 (1961). However, "evidence may be admitted if the government can show that the evidence inevitably would have been obtained from lawful sources in the absence of the illegal discovery." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "The burden of proof is on the government to establish that the tainted evidence

'would have been discovered by lawful means.'" *Leake*, 95 F.3d at 412 (quoting *Nix*, 467 U.S. at 444). "[T]he government can meet its burden of showing that the tainted evidence inevitably would have been discovered through lawful means 'by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence.'" *United States v. Kennedy*, 61 F.3d 494, 500 (6th Cir. 1995) (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989)).

However, as straightforward as the *Terry* standard is, its application to the facts of a given case remains, outside the limits of a few bright-line rules, to a considerable degree indeterminate. The court faces a question of first impression unless there is precedent finding reasonable suspicion in a factual situation that in every relevant respect was no more suspicious, or finding no such suspicion in a factual situation that in every relevant respect was no less suspicious. *See Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983) (stating that in the course of adjudicating the existence of reasonable suspicion, "one determination will seldom be a useful 'precedent' for another"). Given the near-infinite variety of factual circumstances in which *Terry* stops-and-frisks occur, it is unsurprising that neither party can present such precedent, but that both must instead rely on cases with are merely similar in one or more particular aspects.

In this context, we turn to the facts of the present case. As the police entered the premises, they had reason to suspect, or in some instances even probable cause to believe, that the house was used as a factory of counterfeit immigration and identification documents for Mexican nationals and for the trafficking of marijuana. Furthermore, rational inferences warranted reasonable suspicions that those encountered on the premises would either be counterfeiters themselves or their illegal alien customers, because legal residents have of course little need for counterfeit documents, or that they would be armed and dangerous, because drug traffickers tend to be so.

Indeed, the court below made a finding of fact to that effect. At this point the police encountered the defendants, both of whom appeared to be of Hispanic ethnicity, in the back yard.

The court below and the United States rely primarily on *United States v. Bohannon*, 225 F.3d 615 (6th Cir. 2000). In *Bohannon*, while law enforcement agents were executing a search warrant on a residence suspected of being used as a methamphetamine laboratory, two men approached the residence. *Id.* at 616. The law enforcement agents seized and searched the men before they entered the residence, turning up incriminating evidence. *Ibid.* We held that detention of those entering such a premise was constitutional. *Id.* at 617 (expanding on *Michigan v. Summers*, 454 U.S. 692, 705 (1981) (permitting detention of occupants of a premise being searched subject to a warrant)). *See also Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995). We reasoned that most of the rationales underlying *Summers*, prevention of flight if incriminating evidence is found and minimization of risk of harm to the officers, were also present in the circumstances of *Bohannon*, even if the third rationale of *Summers* that the occupants would assist in the orderly completion of the search was not. *Bohannon*, 225 F.3d at 616-17. *See also Leveto v. Lapina*, 258 F.3d 156, 167 n.5 (3d Cir. 2001) (citing *Bohannon* for the proposition that "[a] detention may be reasonable even if fewer than all of [*Summers*] law enforcement interests are present"); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (holding "that officers act within their *Summers* powers when they detain an individual who approaches a searched property, pauses at the property line, and flees when the officers instruct him to get down" because while "this reaches beyond *Summer's* 'occupants' language, it is consistent with the policies that *Summers* has identified"). We held that even "the possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the

circumstances." *Bohannon*, 225 F.3d at 617 (quoting *United States v. Patterson*, 885 F.2d 483, 485 (8th Cir. 1989)).

The defendants point out that the case at bar differs in that they were not entering or leaving the searched residence but were merely present in its backyard. Indeed, this circumstance does render the inference of involvement with the criminal activity inside the house weaker, but only slightly so. Innocent individuals are not significantly more likely to while away their hours in the backyard of a drug and counterfeit document distribution facility than they are to enter or to leave it. And in so far as their presence raises a reasonable suspicion of involvement in criminal activity, the rationales found sufficient in *Bohannon*, prevention of flight and harm to officers conducting the search, are equally applicable here.

The defendants cite numerous cases for the proposition that the additional suspicious circumstances are insufficient to justify a *Terry* stop-and-frisk. Merely observing a suspect conversing with known narcotics addicts by itself is insufficient to create reasonable suspicion. *Sibron v. New York*, 392 U.S. 40, 63-64 (1968). "[M]ere propinquity to others independently suspected of criminal activity does not, without more," give rise to a reasonable belief that the suspect is armed and dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 91-93 (1979). "[W]hile the fact of companionship did not of itself justify [a] frisk . . . , it is not irrelevant to the mix that should be considered in determining whether the agent's actions were justified." *United States v. Bell*, 762 F.2d 495, 498-99 (6th Cir. 1985). "The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 887-88 (1975). The "racially-biased assumption that . . . a man of color wearing dreadlocks . . . must have been an illegal alien from Jamaica" in combination with the "long-

discredited drug source city rationale" was insufficient to create reasonable, articulable suspicion. *United States v. Grant*, 920 F.2d 377, 388 (6th Cir. 1990). Even if "the totality of the circumstances [created] a reasonable basis for suspecting that some roofers [in a town] might be illegal aliens," it did not by itself create reasonable suspicion that a particular Hispanic roofer was an illegal alien. *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 293 (10th Cir. 1996). To fairly quote these precedents is to refute the defendant's argument. All of these precedents merely hold that some particular suspicious circumstances present here are *by themselves* insufficient to create reasonable suspicion; none of them hold that these circumstances are irrelevant or must be disregarded; many of them hold that they are valid factors in a determination of reasonable suspicion.

We hold that the combination of the close factual resemblance to *Bohannon* and the additional suspicious circumstances, in particular the defendants' presence without apparent lawful purpose outside the facility and their appearance, was sufficient to create reasonable, articulable suspicion. Therefore the police officers were permitted to stop and frisk the defendants and the handgun found on Martinez-Rivera was admissible, as the court below correctly ruled. In addition, we note that the police discovered a handgun on the ground, near the defendants and their vehicles. The discovery of this gun was at best contemporaneous with, and, more likely, subsequent to, the search of the defendants. Hence its discovery cannot justify a reasonable suspicion on the part of the police officers conducting the search of the defendants. However, neither can it be argued that the officers, had they not searched the defendants, would have missed the handgun in plain view. Once having discovered the dropped handgun, the officers would most certainly have been justified in searching everybody present, lest there be another handgun. Hence, even had the circumstances prior to the search been insufficient to justify the search, a discovery soon thereafter

would have allowed and caused a search of the defendants, which inevitably would have discovered Martinez-Rivera's gun.

We do not here decide whether the police were justified in handcuffing the defendants and forcing them onto the ground or in taking the documents and billfold from Vite-Espinoza's pocket. However, as both the defendants very shortly thereafter admitted to being illegal aliens, permitting the INS to take them into custody under 8 U.S.C. § 1357(a)(2) and an inventory search incident to such custodial arrest, the defendants fail to demonstrate prejudice. Vite-Espinoza's contention here that the continued questioning in which he admitted his illegal status only occurred because of the documents that had been taken from his person illegally is without support in the record and rebutted by the facts that *all* persons present in the backyard voluntarily admitted that they were illegal aliens and that the officers had sufficient reasonable suspicion to question him prior to his search. Equally meritless is Vite-Espinoza's contention that, as soon as his frisk was concluded without finding any weapon, the police was under an obligation to instantly release him. Although this frisk had arguably not incriminated him, neither did it exculpate him. He was still under the same reasonable suspicion of being an alien illegally in this country as he was before the frisk, and the officers were still allowed to "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). This they did and Vite-Espinoza gave them reason to take him into custody.

### III

The district court held that Vite-Espinoza's truck was not covered by the search warrant, but that the handgun in it would inevitably have been discovered when Grant, a Tennessee Highway Patrol officer, impounded and

inventoried the truck.[1]  Grant testified that he routinely impounded and inventoried cars following arrests. Such impoundments are authorized by Tennessee statute. "A police department may take into custody any motor vehicle found abandoned, immobile, or unattended on public or private property." Tenn. Code Ann. § 55-16-104. "'Unattended motor vehicle' means any motor vehicle . . . that is unattended by reason of the arrest of the driver of such motor vehicle." Tenn. Code Ann. § 55-16-103(6). Vite-Espinoza raises several perfunctory, meritless challenges to the application of the statute, including that the trooper's motive in impounding the car, to protect the lienholder's interest, was not the motive contemplated by the statute, and that the statute was inapplicable as Vite-Espinoza was merely taken into the custody of the INS, not arrested.

Vite-Espinoza also raises an argument of somewhat greater merit under the Tennessee constitution. Tennessee case law has restricted the of the unattended motor vehicle statute for evidence gathering purposes:

[I]f the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. Just cause to arrest the driver is not, alone, enough; there must also be reasonable cause to take his vehicle into custody.

---

[1] The United States here again attempts to argue that the search warrant covers the trucks. But the district court ruled against the government on this question and the government, by not appealing, waived the issue.

*Drinkard v. State*, 584 S.W.2d 650, 653 (Tenn. 1979). The guidelines of *Drinkard* "must be considered by law enforcement officers on the scene." *State v. Lunsford*, 655 S.W.2d 921, 923 (Tenn. 1983). "Our holding does not mandate that an arrestee must be advised of all available options to impoundment; such a per se rule would be unworkable because of changing conditions and circumstances. However, the extent of the consultation with an arrestee is a factor for the trial judge to consider in determining whether the impoundment was reasonable and necessary." *Ibid.* (quoting *Sanders v. State*, 403 So. 2d 973, 974 (Fla. 1981)). There is no recorded case holding impoundment reasonable and necessary under circumstances similar to the case at bar, where the car is safely parked on private property, the arrestee is capable of making arrangements for the car, but is not even asked to do so by the arresting officer, and the impoundment is putatively made for the purpose of protecting a lienholder's interest. The Tennessee cases upholding impoundment typically involve the arrest of an intoxicated driver, incapable of making arrangements for the car, without a companion to take the car, and in a location where the car is likely to be a traffic obstacle or to be stolen. *See, e.g.*, *State v. Howard*, 645 S.W.2d 751, 751-53 (Tenn. 1982).

Evidence found during an inventory search incident to an unreasonable impoundment is "the product of an unreasonable search in violation of the Fourth Amendment and Article I, Section 7, Constitution of Tennessee" and therefore inadmissible in Tennessee courts. *Drinkard*, 584 S.W.2d at 654. The federal constitutional basis of *Drinkard* has been overruled. In the absence of a showing that police acted in bad faith or for the sole purpose of investigation, evidence discovered during inventory search of arrestee's car is admissible. *Colorado v. Bertine*, 479 U.S. 367, 372-73 (1987). "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of

hindsight be able to devise equally reasonable rules requiring a different procedure." *Id.* at 374. But *Drinkard* was also based on the Tennessee constitution and state courts are the final authority on the meaning of state law. *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984). Therefore the *Drinkard* line of cases remains valid Tennessee law. *See, e.g., State v. Crutcher*, 989 S.W.2d 295, 301 n.7 (Tenn. 1999) ("An inventory search of a vehicle will be upheld, however, only when there is no reasonable alternative to seizure of the vehicle." (citing *Drinkard*)).

We conclude that in circumstances such as the present, where there was no violation of the United States Constitution, but there may have been a violation of a state constitution, the appropriate remedy is a civil action in state court, not evidentiary exclusion in federal court. The exclusionary "rule is a judicially created remedy designed to safeguard *Fourth Amendment rights* generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974) (emphasis added). The rule does not protect against violations of state constitutional rights. *See, e.g., United States v. Clegg*, 509 F.2d 605, 614 (5th Cir. 1975) (rejecting as meritless contention that defendant's Fourteenth Amendment rights were violated by introduction of evidence in federal court that would have been excluded by state court). Hence, the district court did not err when it admitted the gun, which would inevitably have been found during the inventory search of Vite-Espinoza's truck. That search did not violate the federal constitution, even if it may have been unlawful under Tennessee precedent.

## IV

For the foregoing reasons, we **AFFIRM** the district court's judgment.

_____

## CONCURRENCE
_____

CLAY, Circuit Judge, concurring. I concur in the outcome reached by the majority in these consolidated cases. I write separately to speak on the manner in which the various law enforcement agencies arrived on the scene. Although not outcome determinative under the facts of this case, the conduct of the law enforcement officers in arriving on the scene with guns drawn, ordering the occupants of the home to lie on the ground while the officers forced their knees into the backs of the occupants (including both Defendants), and immediately handcuffing and questioning the individuals, all after the officers had blocked ingress and egress to the street on which the residence was located, was not reasonable because the conduct went beyond the "limited intrusions on an individual's personal security" required by the circumstances. *Michigan v. Summers*, 452 U.S. 692, 698 (1981) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

### A. Governing Fourth Amendment Jurisprudence

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend IV. Generally, under the Fourth Amendment, an official seizure of an individual must be supported by probable cause, even if no formal arrest is made. *Dunaway v. New York*, 442 U.S. 200, 208 (1979). As the Supreme Court noted in *Terry v. Ohio*, 392 U.S. 1, 16 (1968),

[i]t is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime–"arrests" in traditional terminology. It must be recognized that

whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

Thus, for purposes of the Fourth Amendment guarantee against unreasonable seizures, the "general rule [is that] every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Summers*, 452 U.S. at 699-700; *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person is 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

However, in *Summers*, the Supreme Court recognized that

some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases the intrusion on the citizen's privacy "was so much less severe" than that involved in a traditional arrest that "the opposing interests in crime prevention and detection and in the police officer's safety" could support the seizure as reasonable.

*Id.* at 697-98 (quoting *Dunaway*, 442 U.S. at 209). The Supreme Court has therefore carved out "narrowly drawn" exceptions to the probable cause warrant requirement for seizures not rising to the level of a formal arrest. *United States v. Sharpe*, 470 U.S. 675, 689 (1985) (Marshall, J., concurring) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 115(1977)); *see also* Douglas K. Yatter, et al., *Warrantless Searches & Seizures*, 88 Geo. L.J. 912, 912-13 (2000).

Two of the exceptions recognized by *Summers* are relevant to the matter at hand. Specifically, the *Summers* Court recognized the "stop and frisk" exception as set forth in *Terry*

*v. Ohio*, wherein the Court held that a police officer may briefly stop an individual and conduct a patdown or "frisk" for weapons when the officer has a reasonable suspicion (something less than probable cause) to believe that criminal activity is afoot. *See Summers*, 452 U.S. at 698 (citing *Terry*, 392 U.S. at 16). The other relevant exception recognized by *Summers* is that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* (footnotes omitted) In a footnote to this holding, the Court opined that "[a]lthough special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case." *Id.* at 705 n.21. In *United States v. Fountain*, 2 F.3d 656, 663 (6th Cir. 1993), *overruled on other grounds, Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), this Court extended the exception established in *Summers* regarding the detention of residents of a home being search pursuant to a valid warrant, to the detention of visitors to the home as well.

Despite these exceptions, it must be remembered that the exceptions are just that, and the "general rule [is that] every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Summers*, 452 U.S. at 699-700; *Mendenhall*, 446 U.S. at 554 (finding that a seizure has occurred when a reasonable person under the circumstances "would not have believed that he was free to leave"). The essential attributes of a formal arrest, or stated differently, the point at which the detention ripens into a *de facto* arrest requiring probable cause, is decided on an individual basis. *See Sharpe*, 470 U.S. at 685 ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."); *see also Gardenhire v.*

*Schubert*, 205 F.3d 303, 313 (6th Cir. 2000) ("When a detention rises to the level of a full-fledged arrest, . . . the Fourth Amendment demands that the seizure be supported by probable cause.").

For purposes of determining whether a *Terry* stop has exceeded its permissible scope, this Court has found that "'[w]hen police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause.'" *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000) (quoting *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994)). This Court has also found that when officers restrained an individual in a police cruiser after he refused to consent to a search of a storage locker and truck, the scope of the seizure went beyond the bounds of *Terry* and ripened it into a custodial arrest under the Fourth Amendment. *See United States v. Richardson*, 949 F.2d 851, 857-58 (6th Cir. 1991).

For purposes of determining whether the scope of the detention has exceeded the *Summers* exception that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *Summers*, 452 U.S. at 705 (footnotes omitted), it would appear that so long as the officers do not detain the occupants beyond the point of the premises' search, the detention has not exceeded its permissible scope. This conclusion comports with the legitimate government interests which the *Summers* Court believed justified the detention, such as preventing flight in the event that incriminating evidence is found, minimizing the risk of harm to the officers by allowing officers to exercise unquestioned command of the situation, and facilitating the orderly completion of the search. *See id.* at 702-03 & 705 n.21 (noting that a "prolonged detention" might have led the Court to reach a different result). However, it is not merely the length of the detention that is looked at in determining

whether the detention was reasonable. Rather, the "scope and nature of the restraints placed on an individual's liberty" is also considered. *Yatter, supra* at 920. As the Court noted in *Summers*, "special circumstances" and a "prolonged detention," might have led to a different result. *See Summers*, 452 at 705 n.21.

**B.   Application of the Law to the Facts of Defendants' Motions to Suppress**

As noted, the exceptions to the Fourth Amendment's requirement of probable cause in this case are two. First, under *Summers*, the reasonable detention exception as to the occupants of a residence for which a valid search warrant has been issued applies. *See Summers*, 452 U.S. at 705. Second, the "stop and frisk" exception under *Terry* also applies inasmuch as the officers not only detained Defendants, but made a decision prior to the search that they would invoke *Terry* and conduct a "patdown" for weapons on the belief that drugs may be on the premises. However, when officers from several different law enforcement agencies, including the INS, arrived on the scene with guns drawn, ordered the occupants to lie on the ground, forced their knees into the backs of the occupants (including both Defendants), and immediately handcuffed and questioned the individuals, all after the officers had blocked ingress and egress to the street on which the residence was located, the officers' actions exceeded the reasonableness of *Summers* and *Terry*. Instead, the officers' actions in this regard were tantamount to a *de facto* arrest inasmuch as the seizure had all of the attributes of a formal arrest. *See Mendenhall*, 446 U.S. at 554 ("[A] person is 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *Summers*, 452 U.S. at 698, 700 (noting that the "general rule [is that] every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable

cause" and that *Terry* authorizes "limited intrusions on an individual's personal security").

The case law from this circuit and our sister circuits support this conclusion. *See United States v. Bohannon*, 225 F.3d 615,619 (6th Cir. 2000) (Batchelder, J., dissenting) ("A police officer's verbal command—if heeded—is often sufficient to seize a person" for purposes of taking the matter out of the bounds of the limited and brief nature of *Terry* stops) (citation and internal quotation marks omitted); *Butler*, 223 F.3d at 374 ("The brevity and limited nature of *Terry*-type stops have been repeatedly affirmed.") (citing *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994); *Richardson*, 949 F.2d at 857-58 (finding that the scope and nature of the detention exceeded the bounds of *Terry* when officers restrained an individual in a police cruiser after he refused to consent to a search of a storage locker and truck); *Oliveira*, 23 F.3d at 642, 645-46 (2d Cir. 1994) (finding that a *Terry* stop ripened into a custodial arrest when six police cruisers surrounded the suspects, ordered them from their vehicles at gunpoint, handcuffed the suspects, and placed them in separate police cruisers); *United States v. Anderson*, 981 F.2d 1560, 1566 (10th Cir. 1992) (finding that a *Terry* detention ripened into a custodial arrest when officers blocked suspect with cars and one officer approached the suspect with his gun drawn); *United States v. Codd*, 956 F.2d 1109, 1111 (11th Cir. 1992) (finding that the *Terry* stop resulted in a custodial arrest when suspect was seized, handcuffed, and held for two and one-half hours); *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990) (finding that a custodial arrest occurred when officer gripped the arm of a juvenile, patted him down, ordered the juvenile not to run, and seated him in the back of a patrol car).

Thus, although the officers had a legal basis to detain the occupants of the residence, including Defendants, under *Summers* and *Terry*, the scope and nature of the detention was not reasonable "in view of all of the circumstances

surrounding the incident." *Mendenhall*, 446 U.S. at 554; *see also Summers*, 452 U.S. at 698 (citing *Terry*, 392 U.S. at 16).

It is true that the officers had made a decision prior to executing the warrant that any individuals found on the premises would be "detained" and frisked for weapons because of the marijuana seeds found in the trash pull conducted earlier that day; however, when asked whether by the term "detained" the officers meant "arrested"or just "monitored," Secret Service Agent Monica Woods replied "monitored." (J.A. at 143.) Specifically, the questioning of Agent Woods went as follows:

Q:  [P]rior to the execution of the warrant, was there a meeting of the various agencies and individuals who're part of the search warrant execution team?

A:  Yes.  Everyone who was part of the search warrant was involved in a briefing just prior to the search warrant.

Q:  Had the issue of whether or not people who were on the property, if people on the property, were encountered, what if anything would be done with those people during the execution of the warrant?

A:  All of those people would be patted down for weapons and detained until we decided what steps to take next.

Q:  Now, by detained, *do you mean placed under arrest or just put to the side and monitored?*

A:  Yes, monitored.

(J.A. at 142-43 (emphasis added).)

Indeed, under the agent's own testimony, the scope and nature of the detention went well beyond that which had been agreed to prior to the time the search warrant was executed. Had the officers followed the plan attested to by Agent Woods—arriving on the scene, patting down the occupants of the home, and putting them to the side until the search had been completed, at which point the occupants may or may not have been arrested depending upon whether evidence of criminality had been found—the conclusion would be different inasmuch as the officers' actions would have been within the reasonableness of *Summers* and *Terry*.

## C.  Conclusion

Although the law enforcement officials' actions upon arriving on the scene were unreasonable, I concur in the outcome reached by the majority because, under the facts of this case, the evidence was otherwise discovered through lawful means.